Argued September 24, affirmed October 22, 1952.

# SMILEY *v.* ACKERMAN ET AL.
### 249 P. 2d 168

*Warde H. Erwin,* of Portland, argued the cause for appellant. On the brief were Boyd, Ferris & Erwin, of Portland.

*E. B. McCutchan,* of Portland, argued the cause and filed a brief for respondents.

Before BRAND, Chief Justice, and LUSK, LATOURETTE, WARNER and TOOZE, Justices.

TOOZE, J.

This is a suit to cancel, set aside, and declare void certain conveyances of real property, and for an accounting, brought by Marianne Moriet Smiley, as plaintiff, against G. C. Ackerman, John Walker, George H. Claussen and Evelyn Claussen, his wife, Zygmont W. Karwoski, and Ben Anderson, as defendants. The trial court entered a decree in favor of all defendants and dismissed plaintiff's suit; plaintiff appeals.

Plaintiff formerly was the wife of defendant Karwoski. They were married in February, 1938, at Denver, Colorado, and in December, 1943, moved to Portland, Oregon, where they have since resided. On July 2, 1944, Mr. and Mrs. Karwoski became tenants in an apartment house known as "The Russell Apartments", located at 729 North Russell street, in Portland. These premises were owned by one William B. Webb, since deceased, but who in 1944 was a man more than eighty years of age and in poor health. Webb paid $9,000 for this property, which is particularly described as follows:

"Lots 5, 6, and 7 of Block 9, subdivision in Proebstel's Addition to Albina, and a strip of land

south of and adjoining lots 6 and 7, lying between the south line of said lots and the north line of N. Russell street and between the west line of said lot 6 and the east line of lot 7, extended, in the city of Portland, Multnomah county, Oregon.''

Karwoski and his wife assisted Webb in the work incident to the apartment house operation, also giving personal care and attention to Webb. For a brief period of time, Mr. and Mrs. Karwoski lived at University Homes, in Portland, but they went to the Russell Apartments daily to look after Webb. They returned to live in the Russell Apartments in late August, 1946.

In 1946, in consideration of certain cash payments made by Mr. and Mrs. Karwoski, in addition to the help and care they had given him, Webb executed and delivered a deed conveying said apartment house premises to Marian M. Karwoski. Although only Mrs. Karwoski was named as grantee, it was understood that the conveyance was for the benefit of both Mr. and Mrs. Karwoski.

On October 14, 1946, Webb executed his last will and testament. This instrument was written by Mrs. Karwoski, signed by Webb, and properly witnessed. By its terms, Mrs. Karwoski was named the sole legatee and devisee, and also as executrix to serve without bond. Webb died on July 5, 1947, and his last will and testament was duly admitted to probate in the circuit court for Multnomah county on July 17, 1947, and Marian M. Karwoski was appointed executrix thereof. In these probate proceedings, Mrs. Karwoski was represented by Leo Levenson, her attorney.

On April 23, 1947, Marian M. Karwoski duly acknowledged a warranty deed which she had executed as grantor, with Zygmont Walter Karwoski named as grantee, wherein said apartment house premises, including all furniture therein, were conveyed to said

Zygmont Walter Karwoski. This instrument was also written by Mrs. Karwoski in her own handwriting. This deed was placed in a safety deposit box in a bank and was withdrawn at the time of the divorce proceedings hereafter mentioned. On the trial of the instant suit, some question was raised as to whether or not there had been a delivery of this deed, but a decision upon that matter is unnecessary in this litigation.

During all the time that said apartment house property was in possession of Mr. and Mrs. Karwoski, she kept the books connected with its operation and was in active charge as manager. She kept an excellent set of books. The writing was neat and exceptionally legible, indicating that Mrs. Karwoski is a good penman.

On June 10, 1948, Marion M. Karwoski, as plaintiff, filed a complaint for divorce in the circuit court for Multnomah county, against Zygmont W. Karwoski, as defendant, charging said defendant with cruel and inhuman treatment, including physical violence against her person. She also alleged that she was the sole owner of the Russell Apartments. Plaintiff was represented in this suit by Larry Landgraver, as her attorney.

On June 21, 1948, defendant Karwoski appeared in said divorce suit by filing a plea in abatement which, omitting formal parts, reads:

"I

"That the plaintiff above named was at the time that she filed the complaint in the above entitled case suffering from an attack of idiotic epilepsy and was deprived thereby of her sense of reason, did not have full possession of her mental facilities, was so susceptible of influence from other parties that she could not control her own will, and did not realize, understand or appreciate the meaning of her own acts.

## "II

"That plaintiff is a constant sufferrer [sic] from said disease, continually and daily takes three different kinds of medicine therefor, frequently suffers a recurrence of attacks during which she loses control of her mind and experiences an affliction commonly known as fits; that said disease has caused her to be confined at times past in the State Hospital at Dixon, Illinois (13 years), St. Anne Institution, Illinois, and Oregon State Hospital, Salem, Oregon; that, during 1945, plaintiff suffered such an attack when defendant was not present, and those who saw plaintiff did not realize the nature of her illness, with the result that she was taken to the Portland Police Station as a drunk person; that plaintiff has, during the previous recurrence of similar attacks, driven defendant and other persons out of her place of residence and has attempted to secure an attorney for the prosecution of a divorce action against defendant, but that when her true condition has been realized, suit has not been brought and plaintiff has eventually recovered from her affliction.

## "III

"That plaintiff was at the time of filing and signing the complaint for divorce in the within entitled case under the care and treatment of two eminent and capable local physicians, to wit: Drs. William H. Pearson and Herman A. Dickel, and that defendant left and departed from the family place and abode only for the reason that Dr. William H. Pearson suggested and recommended it as a possible means of assisting in the early cure of the plaintiff; that these doctors are continuing to investigate and prescribe and treat plaintiff, and that this case should be continued until such time as it can be determined medically whether or not the plaintiff is in sufficient control of her mental facilities to understand the nature of her acts.''

The plea in abatement was overruled and denied by the court, and on August 11, 1948, defendant Karwoski filed his answer to the complaint. Defendant denied that plaintiff was the sole owner of the real property described in her complaint, and also denied the charges of cruel and inhuman treatment made against him. Affirmatively, defendant pleaded a one-half interest in the real property as belonging to him. He prayed a decree dismissing plaintiff's suit, or, in the alternative, that he be declared the owner of an undivided one-half interest in said real property. In filing his answer, and on the trial of the suit, defendant was represented by Ben Anderson, as his attorney.

The divorce suit came on for trial during the latter part of August, 1948, before the Honorable H. Lawrence Lister, as circuit judge pro tem. Approximately two whole days were devoted to the trial, many witnesses being called to testify, including both plaintiff and defendant. The trial judge took the matter under advisement.

On August 26, 1948, after rather tedious negotiations in which both plaintiff and defendant, together with their respective attorneys, actively participated, a written agreement of property settlement was entered into between plaintiff and defendant. In arriving at such settlement, each paragraph of the agreement was fully considered and discussed and agreed upon, resulting in having each paragraph written separately upon a separate sheet of paper. The parties were required to sign each sheet, as well as the conclusion.

It is unnecessary to invite attention to all the provisions of this agreement. We refer only to the most important. It is provided in the first place that each party should be awarded an undivided one-half interest

in the property. Next, the parties agreed that the premises were in need of major repairs; that a loan would be necessary to secure the money for that purpose; and they agreed to cooperate in negotiating such a loan. They then agreed that, after the repairs were made, the property should be sold, and the proceeds of such sale divided share and share alike. It was further stipulated that, in the event a sale was not consummated within four months, then either party might submit to the other a give or take bid for the purchase of the property. Until the sale of the property, the parties were to share equally in the profits realized from its operation, with an accounting each month. Management of the property was to remain with the plaintiff Marion M. Karwoski pending sale thereof. It was also agreed that, from the proceeds of the loan to be obtained, plaintiff's attorney, Larry Landgraver, was to receive the sum of $1,500 to apply on account of attorney's fees for services rendered the plaintiff, said amount to be charged to her account. The loan was later secured in the sum of $7,500.

This agreement was filed in the divorce suit, and on August 27, 1948, there was duly entered in said court and suit a final decree in favor of plaintiff, approving the property settlement agreement, awarding plaintiff a divorce, and restoring to her her former name, Marianne Moriet.

Ben Anderson, attorney for the defendant Karwoski, received in payment for all his legal services rendered on behalf of Karwoski one-fourth of Karwoski's share of the proceeds of the sale of the apartment house as hereafter mentioned.

Karwoski and his wife made several attempts to sell the property during 1948. They fixed a sale price of $65,000. However, on January 4, 1949, they listed

the property for sale with G. C. Ackerman and John Walker, real estate brokers, at the price of $50,000. This listing was in writing upon a form approved by the Portland Realty Board.

We now digress a moment for the purpose of disclosing the part which the defendants Claussen played in the transaction. On and prior to January 4, 1949, defendants George H. Claussen and Evelyn Claussen, his wife, were the owners in fee of the following described real premises:

"A tract of land in Section 23, Township 1 South, Range 2 East of the Willamette Meridian, in the County of Multnomah and State of Oregon, described as follows:

"Beginning at a concrete monument at the southeast corner of the J. Johnson Donation Land Claim; thence south 88° 51' west 1181.60 feet; thence south 11° 50' west 325.70 feet; thence south 44° 22' west 352.80 feet; thence south 40° 41' west 183.27 feet; thence north 88° 51' east 323.77 feet to the southwest corner of the tract of land conveyed to William C. Brandon and Frances A. Brandon by deed recorded December 24, 1946 in Book 1131 page 193, Deed Records, and true place of beginning of the tract to be described; thence north 88° 51' east along the southerly line of the Brandon Tract, 125.0 feet; thence south 36° 24' west 250.0 feet; thence south 88° 51' west 125.0 feet to the easterly line of a dedicated road; thence north 36° 24' east along the easterly line of said road, 250.0 feet to the true place of beginning."

The foregoing property is located on Arnold way in southeast Portland, and is a show place. In January, 1949, it was rented for $150 per month, on a month to month basis. The Claussens had purchased the property for approximately $15,000.

At some time after January 4, 1949, but prior to January 12, defendants Claussen offered to purchase

the apartment house property for a total price of $40,500, to be constituted as follows: a down payment of $2,500 in cash; a conveyance of the Arnold way property at the agreed price of $18,000; a note, secured by a mortgage on the apartment house property, for $20,000, repayable at the rate of $300 per month, with interest at 4 per cent per annum. Defendant Karwoski and Marianne I. Moriet accepted this offer, and on January 12, 1949, all parties executed an earnest money receipt, setting forth the terms of sale. Defendants Claussen paid the $2,500 in cash upon execution of such receipt.

In order to carry out the terms of the deal, all necessary deeds, notes, and mortgages were executed and delivered. Defendant Karwoski and his former wife did not have sufficient cash available to pay off several liens, including a mortgage lien, against the apartment house property, and the costs and expenses of the sale, including real estate broker's commission. It had been agreed that Karwoski would accept the Claussen note and mortgage for his part of the sale price of the apartment house, but there were cash adjustments to be made between him and his former wife.

Because of this need for ready cash, defendants Claussen agreed to and did loan Marianne I. Moriet the sum of $8,000, taking as security therefor a mortgage upon the Arnold way property. The note and mortgage to the Claussens were executed on February 1, 1949. The note bears interest at 5 per cent per annum.

The liens were paid off against the apartment house property, and all other expenses incident to the sale were liquidated, including a payment to Karwoski on the part of his former wife in the adjustment

of their interests. The mortgage against the apartment house property executed by the Claussens was taken by Karwoski and Ben Anderson as their interests might appear.

For about a month after the transaction was consummated, Marianne I. Moriet continued as manager of the apartment house for the Claussens. Also about a month after she became the owner of the Arnold way property, Marianne I. Moriet lost her tenant thereon. Thereafter, the property was not rented, and it was permitted to become in a state of disrepair which very materially affected its value.

On June 13, 1950, plaintiff filed her amended complaint in this suit; whereby she seeks to have cancelled not only the deed to the apartment house, but also the note and mortgage given by her to the Claussens. She also seeks to have cancelled the property settlement agreement entered into between herself and Karwoski in the divorce proceeding, together with the deed she executed in his favor.

She bases her claim to relief upon two grounds: (1) alleged fraud on the part of the defendants Ackerman, Walker, and Claussens; and (2) mental incompetency to handle her own affairs. The allegations in plaintiff's complaint were put to issue by the several answers of defendants in which both fraud and mental incompetency were denied. The defendants Claussen pray affirmatively for a foreclosure of their mortgage on the Arnold way property.

The charge of fraud was practically abandoned upon the trial. There is not a scintilla of evidence in the record to justify a finding of fraudulent conduct upon the part of anyone connected with this transaction. Upon the oral argument in this court, it was frankly conceded by plaintiff that the defendants

Claussen acted in perfect good faith and were innocent purchasers for value. Plaintiff based her claim entirely upon mental incompetency, and the entire record is devoted to testimony touching that subject.

In passing, we note that, neither in her amended complaint nor upon the trial, did plaintiff offer to place the Claussens in statu quo. The reason for this failure is quite apparent from the record. Plaintiff cannot place them in statu quo. It is impossible for her to return the Arnold way property in a reasonably good condition and state of repair, nor has she any funds with which to reimburse any of the parties for their outlays in cash, or any part thereof. Of course, it might be argued that, if she secured a return of the apartment house property, she could mortgage it for enough to secure the necessary funds.

■ In 17 CJS, Contracts, 904, § 418, the following rule is stated:

> "Under the common law and statutes declaratory thereof, a contract of a person of unsound mind may be rescinded or avoided where the parties may be placed in statu quo even though the opposite party was ignorant of conditions and has no reasonable cause to suspect, and the contract was fair and reasonable and made in good faith for adequate consideration."

In 17 CJS, Contracts, 921, § 439, it is stated:

> "The general rule, in some jurisdictions affirmed by statute, is that a party seeking to rescind must restore, or offer to restore the consideration or whatever he has received under the contract. This rule does not depend on the reason for rescission, and it applies to a contract voidable because of fraud or misrepresentations, duress, or mistake, or because executed under the influence of opiates, or intoxicants, or because one of the parties was of unsound mind."

See also *Milton v. Hare et al.*, 130 Or 590, 280 P 511; *Rayburn et al. v. Norton*, 117 Or 328, 243 P 560.

■ However, in equity, a contract may be rescinded, although the parties cannot be placed in statu quo, where the clearest and strongest equity demands such relief, and equity can still be done between the parties, and the rescinding party makes such restitution as is just and within his power; but it will give relief only where the clearest and strongest equity imperatively demands it. 17 CJS, Contracts, 921, § 438.

■ A decision in the instant case depends entirely upon how we evaluate the evidence disclosed by the record. We are mindful of the fact that the trial judge heard the several witnesses testify, was able to observe their conduct and demeanor while under examination, and to note the many little incidents that occur upon the trial that cannot be made a matter of record, but which, in most cases, point to the truth far more accurately than the spoken word. Because of this, the ultimate findings of the trial judge are always entitled to great weight, and in this court we accord such weight to them, although we are in no sense bound thereby.

If we accept the testimony of the plaintiff and her former husband at its face value, there is no doubt but that plaintiff was mentally incapacitated for a period of many months, commencing in the spring of 1948 and continuing until the late spring of 1949; in other words, such incapacity existed during all the time in which the transactions involved here occurred.

According to plaintiff's testimony, she did not know her attorney Landgraver; she had no memory of the divorce proceedings in the summer of 1948, nor of the property settlement between her husband and herself; she did not even know that she had married one Robert

Smiley at Astoria on March 19, 1949. There is no question but that plaintiff suffered periods of mental derangement, some due perhaps to epileptic attacks, and others to the excessive use of intoxicating liquors. But these attacks, as explained by Dr. Herman A. Dickel, were episodic, and, between the attacks, plaintiff was perfectly normal. We note in particular that, though plaintiff claimed to have no knowledge about the divorce suit commenced in June, 1948, nevertheless, she seemed fully acquainted with the details incident to preparing and filing the final account in the Webb estate in July, 1948.

As to Karwoski's testimony, it is clear that he is an interested party adverse to the other defendants. He evidently hopes to gain by a favorable decree for plaintiff. Although he and plaintiff were divorced, yet at the time of trial, he was living with her in his own home. In fairness, however, it should be stated that in the meantime plaintiff had been divorced from Smiley.

The trial judge was evidently impressed, as are we, that plaintiff's actual memory as to events was much better than she pretended. She made altogether a too perfect case for herself. Her memory seemed good when such condition would not injure her cause, but it was woefully deficient when the shoe pinched. Her testimony in that regard just does not square with the record and other testimony offered.

Dr. Dickel testified: "It was my feeling when I saw her in June and July of 1948, that she was definitely psychotic at that time, but because of the history it would appear that her psychotic behavior was definitely an episodic sort of thing and might appear one day and disappear another." Plaintiff had been referred to Dr. Dickel by her regular physician, Dr.

Pearson. It is significant that Dr. Pearson was not called to testify.

To support her contention, plaintiff called some lay witnesses. One of such was Danny Wright who in 1948 was twenty years of age. On October 8, 1948, plaintiff executed a special power of attorney appointing Wright as her attorney in fact to manage the Russell Apartments. Wright acted as manager for 3 weeks, but he lived there from about the middle of September until the latter part of October, 1948. He testified that he kept company with plaintiff during that time. As to her condition at times, he said: "Well, she drank quite a bit, and she would get into spells where she would cry and bawl. She would go into the bedroom and a lot of times she would be laying down, and she would fall off, and you would try and pick her up, and she would be shaking and her eyes would be glassy, and you would try to speak to her, and she would be saying things that you wouldn't know nothing about, and, well, that is about it. * * * There were times when she was normally all right."

Another witness was John L. Krueger who became a tenant in the Russell Apartments on October 1, 1948, and has lived there since. Krueger had a key to plaintiff's private apartment, and also kept company with her. He testified to two occasions when plaintiff was not normal, one during the Christmas holidays of 1948, and the other in the spring of 1949. He said these spells lasted for two or three days. During those times, plaintiff appeared hazy, her eyes were glary, and she acted strangely. However, he testified that on both occasions plaintiff had been using intoxicating liquors to excess. In speaking of her bad spell near Christmas, he said: "Well, it was from drinking at Christmastime." He also stated that,

when she was not having these spells, plaintiff was normal and rational.

Leo Levenson, the attorney who handled the Webb estate matter for plaintiff, testified as follows:

"Q And did that situation continue from the time you first became acquainted with her until the close of the probate, or, if you will, describe it.

"A Not always; not always. There were times that she was calm, just as normal as any of us, and then there were times when she was very emotional for no reason at all, and I attributed that to probably an incipient change of life. That was my observation.

"Q Did that condition remain more or less static during the time that you represented her?

"A The only problem I had with her is that, like lots of women, she changed her mind often, and I just let it go at that.

"Q Toward the time that the last accountings were made, did you observe any change in the situation?

"A No. In connection with the estate we had no problems other than when we were going to sell property, there was always a question of pinning her down. Do we sell it at the price that we are offered? And, as I say, she was erratic, but eventually we closed up the estate. I thought enough about her that I would say that she was—

"MR. McCUTCHAN: I can't hear you, Mr. Levenson.

"A I saw nothing that I would say indicated she didn't know what we were doing. I would just say she was emotionally aroused from time to time, and I didn't know what to charge that to except that she was starting to have domestic trouble with her husband. I didn't want to represent her husband, and I didn't want to represent her in connection with her domestic trouble, because he also came to the office, and I attributed

some of her emotional strain to the domestic trouble, and also to what I thought was incipient menopause condition.

"* * * * * *

"Q Mr. Levenson, was there anything about her manner during the time she served as executor or administrator of the Webb estate which indicated to you that she ought to have had a guardian?

"A No, I wouldn't say that she was any different than a lot of women who are called upon to handle business. She would get upset very easily, but there was nothing wrong with her mentally, as far as I could see. She was erratic. She would change her mind, tell me one thing one day, and go home and call me up and tell me just the opposite. Then I would have her come down to tell me face to face what she wanted to have done, and, of course, I told her that she should keep a strict accounting of everything, and I think you will find with the estate that she did that. She was very changeable."

It must be remembered that the Webb estate matter was in the probate court for more than a year, commencing in July, 1947.

Larry Landgraver, plaintiff's attorney in the divorce suit, testified:

"Q I will ask you whether or not any of the outward manifestations of this client of yours, while you were handling her case, put you on notice that she was the type of person who didn't understand or comprehend what was being done for her.

"A No. I would say this: that during the many times that she was in my office there were times when she would be particularly irritated, like most divorce clients. She had had an argument with her husband over something during the time that the divorce was pending, and she would be a little angry—no more so than probably any other divorce

client. But generally she was well dressed, her hair was well done, clothing was very neat, and generally she would have somebody with her—very jolly, and particularly so after the divorce, particularly so then.

"Q She didn't show any lack of business ability or power to comprehend, did she?

"A No; on the contrary, she prided herself in the way she was able to do business and deal with business people.

"* * * * * *

"Q Was she ever incoherent in her statements to you concerning the matters connected with her divorce or her property or any other matters of that character?

"A No; she could tell you with minute particularity everything concerning the way she met this old gentleman, her benefactor, and everything about it.

"Q And her answers to you in your discussions were perfectly proper?
"A How is that?

"Q Were perfectly normal. Her answers were coherent in every respect?
"A Yes.

"Q In all your dealings with her?
"A That's correct."

The defendants who testified never noted anything out of the way insofar as plaintiff's mental condition and business acumen were concerned.

■■ We have given careful attention to the entire record. Though we have not discussed all of the testimony offered, that does not mean that we have not considered it. The record consists of 435 typewritten pages. It must be remembered that in this case the burden of proof rests with plaintiff. It is frankly conceded

that the evidence establishes beyond all peradventure of doubt that at times plaintiff was irrational, but it wholly fails to establish mental incompetency at any of the times material to the issues in this case. On the other hand, the record shows plaintiff to be a woman of some business ability, neat in appearance and in her bookkeeping, perfectly normal most of the time, and able to take care of her own affairs. From the standpoint of plaintiff, the most we can say from the record is that she has been improvident, and we attribute that as much, if not more, to her mode of living and the use of intoxicants than to her physical and mental illness.

Before concluding, we feel that mention should be made of the fact that the given name of plaintiff appears spelled in various ways in the several transactions involved in this case; namely, Marianne, Marian, and Marion. That also is true of the given name of defendant Karwoski; it appears as Zygmont, Zymont, and Zygmond.

We find no occasion to disturb the findings of the able trial judge and the decree based thereon.

The decree is affirmed. No party to recover costs.